UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

C-INNOVATION, LLC                           CIVIL ACTION

VERSUS                                      NO. 20-2631

TRENDSETTER ENGINEERING, INC.               SECTION M (1)

## ORDER & REASONS

Before the Court is the motion of defendant Trendsetter Engineering, Inc. ("Trendsetter") to dismiss for lack of personal jurisdiction and/or case or controversy.[1]  Plaintiff C-Innovation, LLC ("C-Innovation") responds in opposition,[2] and Trendsetter replies in further support of its motion.[3]  Having considered the parties' memoranda, the record, and the applicable law, the Court issues this Order & Reasons denying the motion.

## I.      BACKGROUND

This case involves a patent dispute over a process to unclog subsea flow lines.  In oil-and-gas production, subsea flow lines transport oil and gas from production wells.  Sometimes these pipes get clogged with solid bodies known as hydrates.  Hydrate remediation is the process by which this backup is cleared so the oil and gas can continue to flow.  Essentially, this case revolves around which company invented a new method to unclog the pipes and whether the companies are even using the same method.

---

[1] R. Doc. 11.
[2] R. Doc. 16.
[3] R. Doc. 20.  On December 3, 2020, C-Innovation filed an amended complaint.  R. Doc. 14.  Trendsetter filed an additional motion to dismiss reasserting its arguments to apply them to the amended complaint.  R. Doc. 21. C-Innovation opposed by incorporating its own previously-briefed arguments.  R. Doc. 22.

Trendsetter is alleged to be a corporation with its headquarters and principal place of business in Texas that occasionally does work in Louisiana.[4]   C-Innovation is alleged to be a company headquartered in Mandeville, Louisiana.[5]   Meetings with representatives of Trendsetter and C-Innovation have taken place in both Texas and Louisiana.[6]

In November 2015, an oil platform operator hired FMC Technologies Offshore, LLC d/b/a FTO Services ("FTO Services"), a joint venture affiliated with C-Innovation, to "remediate a hydrate plug in subsea flow lines in the Gulf of Mexico" (the "2015 Project").[7]   The process used was outlined in a document titled "Operations Procedure."[8]   On February 3, 2016, FTO Services filed International Patent Application No. PCT/US2016/016320 describing and claiming this process.[9]   On August 10, 2017, the application was published as international publication No. WO 2017/135941 A1.[10]   The joint venture was dissolved in August 2016.[11]   In October 2016, members of the 2015 Project team presented a paper outlining the method called "Hydrates Remediation: An Innovative, Simplified Effective and Field Proven Solution" at the Rio Oil & Gas Expo and Conference in Brazil.[12]

On August 25, 2016, C-Innovation, Trendsetter, and Halliburton Energy Services, Inc. ("Halliburton") entered into a memorandum of understanding to form a coalition "to conduct subsea hydraulic well intervention … and field inspection, maintenance and repair … operations

---

[4] R. Docs. 11-1 at 8; 11-2 at 4.   "While Trendsetter does occasionally meet with clients in Louisiana to implement services to be performed in federal waters offshore from Louisiana, all contracting, engineering and management of these operations is conducted in Trendsetter's facilities in Houston[,] Texas."  R. Doc. 11-1 at 9.

[5] R. Doc. 16 at 5.

[6] R. Docs. 11-1 at 10; 16 at 14.

[7] R. Doc. 14 at 3.

[8] R. Doc. 14 at 3; 14-2.

[9] R. Doc. 14 at 5.

[10] R. Docs. 14 at 5; 14-5.

[11] R. Doc. 14 at 5.

[12] R. Docs. 14 at 5-6; 14-6.

in the Gulf of Mexico."[13]  C-Innovation and Halliburton were identified as Louisiana companies.[14] C-Innovation would be the prime contractor responsible for leading the marketing effort and managing onshore and offshore projects.[15]  Trendsetter would be the subcontractor responsible for managing subsea equipment and operations, supporting marketing, and providing subsea engineering and offshore technicians.[16]  This collaboration set the stage for the patent dispute at the center of this case.

By Trendsetter's account, on September 28, 2016, Trendsetter learned that Halliburton was invited to submit a proposal to LLOG Exploration Company ("LLOG") on a hydrate-intervention job.[17]  Trendsetter completed the actual proposal on October 4, 2016.[18]  According to Trendsetter, on October 11, 2016, representatives from C-Innovation, Trendsetter, and Halliburton met with LLOG to discuss the project.[19]  Halliburton proposed the hydrate-remediation plan used in the 2015 Project.[20]  Trendsetter alleges that, after hearing Halliburton's proposal, Mike Cargol, vice president of rentals and services at Trendsetter, "proposed a new and different hydrate remediation process for the LLOG project, which later formed the basis of Trendsetter's '785 Patent."[21]  LLOG agreed to use the newly-developed method and orally awarded the contract to Halliburton on October 20, 2016.[22]  Trendsetter began work the next day even though there was no formal, written contract.[23]

---

[13] R. Docs. 11-2 at 5 & 9; 16-1 at 2.
[14] R. Docs. 11-2 at 12; 16-1 at 2.
[15] R. Doc. 11-2 at 10.
[16] Id.
[17] R. Doc. 11-3 at 2.
[18] Id. at 3.
[19] R. Doc. 11-2 at 6; 11-3 at 3.
[20] R. Doc. 11-3 at 3.
[21] R. Doc. 11-2 at 6.
[22] R. Doc. 11-2 at 6; 11-3 at 4.
[23] R. Doc. 11-2 at 6-7; 11-3 at 4.

According to C-Innovation, representatives of C-Innovation, Halliburton, and Trendsetter met several times from October 2016 through December 11, 2016 "including in Covington, Mandeville, and Port Fourchon, Louisiana," to plan and complete two hydrate-remediation projects.[24]  C-Innovation alleges that they agreed to use the process employed in the 2015 Project.[25] Through these meetings, Kevin Knight, a systems engineer at C-Innovation, who formerly worked with FTO Services, disclosed details and copies of technical reports and schematic drawings of the 2015 process to Trendsetter executives and other project team members.[26]

Around October 28, 2016, C-Innovation alleges that for the first project, it deployed the *Island Performer* from Port Fouchon to perform hydrate-remediation operations employing the process used in the 2015 Project and utilizing support from Trendsetter employees working in Louisiana.[27]  From December 2 through 11, 2016, C-Innovation again deployed its vessel from Port Fouchon to complete the second flow-line project.[28]  C-Innovation says the process utilized in the 2015 Project method was used once more.[29]

On November 11, 2016, Trendsetter filed an application for a provisional patent on what it claims to be its hydrate-remediation process.[30]  But C-Innovation alleges that the figures in Trendsetter's application appear to mimic the schematic drawings C-Innovation shared during the 2016 meetings in Louisiana.[31]  On November 9, 2017, Trendsetter filed a non-provisional patent application, No. 15/808,255.[32]  The patent was awarded as U.S. Patent No. 10,273,785 B2 (the

---

[24] R. Docs. 14 at 7; 16 at 5; 16-1 at 3.
[25] R. Doc. 16-1 at 3.
[26] R. Docs. 16-1 at 3; 14-7.
[27] R. Doc. 14 at 7.
[28] *Id.* at 7-8.
[29] *Id.* at 8.
[30] R. Docs. 11-2 at 7; 14-1.
[31] R. Doc. 14 at 8-9.
[32] *Id.* at 9.

"'785 Patent") on April 30, 2019.[33]  C-Innovation alleges that Trendsetter applied for this patent

using the information C-Innovation provided at the 2016 meetings.[34]  Trendsetter, however, insists

that it discovered the remediation process described in the '785 patent on its own.[35]

In May 2019, C-Innovation was approached by a client to remediate a flow line.[36]  C-

Innovation planned on using the process from the 2015 Project.[37]  On May 30 2019, Trendsetter

notified C-Innovation that Trendsetter had received the '785 Patent.[38]  On June 24, 2019,

Trendsetter sent a copy of the '785 Patent to C-Innovation's prospective client.[39]  The client

expressed concern to C-Innovation "about what it viewed as an express threat of litigation."[40]  And

the client allegedly would not hire C-Innovation for a project in Louisiana unless C-Innovation

obtained a license for the '785 Patent.[41]

On July 1, 2019, David Older, the executive vice president of corporate development at

Trendsetter, and David Sheetz, vice president of C-Innovation, met at C-Innovation's Houston

office to discuss the patent.[42]  Older attests that "[p]rior to this time, I had not been aware of the

2015 Project nor had I previously seen the documents provided by Mr. Sheetz but informed Mr.

Sheetz that I felt confident that the Trendsetter method was clearly distinct from the FTO Services

method and would survive a validity challenge."[43]  C-Innovation asserts that Older, somewhat

---

[33] R. Doc. 11-2 at 7.
[34] R. Doc. 16 at 5.  C-Innovation has four arguments why the '785 Patent is invalid: "(1) the method claimed in the '785 Patent was in public use or on sale within the industry before Trendsetter filed its patent application; (2) Trendsetter misrepresented the identity of the true inventors of the patented method; (3) Trendsetter copied technical drawings and information disclosed by C-Innovation and held them out as the work product of its employees; and (4) the patent claims were anticipated and obvious in view of prior art."  *Id.* at 10.
[35] R. Docs. 11-2 at 6; 11-3 at 1.
[36] R. Doc. 14 at 11.
[37] *Id.* at 11-12.
[38] R. Docs. 11-1 at 10; 11-2 at 7;16 at 6.
[39] R. Doc. 14 at 12.
[40] *Id.*
[41] R. Doc. 16 at 12.
[42] R. Docs. 11-1 at 10; 11-2 at 7; 16 at 12.
[43] R. Doc. 11-2 at 7.

contradictorily, "refused to concede that the remediation method utilized by C-Innovation did not infringe the '785 Patent."[44]  C-Innovation asserts further: "Older stated that Trendsetter needed assurance that the Trendsetter manifold would be used for C-Innovation's planned hydrate remediation process instead of the manifold provided by its competitor.  He then demanded that C-Innovation pay a royalty under a license agreement if it provided the hydrate remediation process to its client without using Trendsetter's manifold."[45]  As a result of this meeting and subsequent negotiations, C-Innovation entered into a license agreement (the "License Agreement") with Trendsetter to take a non-exclusive license to the '785 patent.[46]  The License Agreement identifies C-Innovation as a Louisiana company,[47] and Dino Chouest executed the agreement on C-Innovation's behalf from its office in Cut-Off, Louisiana.[48]  C-Innovation alleges that Trendsetter used "express and tacit threats of a patent infringement suit" to coerce it into entering into the License Agreement.[49]  The hydrate-remediation project requiring the License Agreement was mobilized from Louisiana.[50]  C-Innovation, from its Louisiana offices, paid Trendsetter $124,000 in royalties.[51]  C-Innovation was the only licensee under the Trendsetter patent, but the license had to be renewed "on a 'project' basis."[52]

As a consequence, on July 24, 2020, Sheetz (C-Innovation), with a prospective client in hand, emailed Older (Trendsetter) asking if the rates and terms of the existing License Agreement could be continued for a new hydrate-remediation project.[53]  Older stated the original terms would

---

[44] R. Doc. 16 at 9.
[45] *Id.* at 12 (citations omitted).
[46] R. Docs. 11-1 at 10 & 17; 11-2 at 7-8; 14-12.
[47] R. Doc. 16 at 7 n.6 (citing R. Doc. 14-12).
[48] *Id.* at 17 n.9.
[49] *Id.* at 5.
[50] *Id.*
[51] *Id.* at 13.
[52] R. Docs. 14-12 at 2; 11-1 at 11; 16 at 13.
[53] R. Docs. 11-1 at 10-11; 11-2 at 8 & 15.

be honored.[54]   On August 25, 2020, Older requested an update to which Sheetz responded: "Nothing as of now."[55]

When C-Innovation requested a change to the License Agreement to clarify that the license covered its client, BP, and other contractors, Trendsetter responded that it would need to contract directly with BP.[56]  Nicholas Gault, vice president of finance at Trendsetter, subsequently emailed Sheetz: "David, any additional thoughts on the license agreement?  We do not want to inhibit your upcoming work with BP, so please let us know if you would like us to pursue the license agreement with BP or if [C-Innovation] will accept that the agreement will cover [C-Innovation], [its] customer, and [its] subcontractors only."[57]   C-Innovation took this to be an express threat of litigation.[58]

On September 28, 2020, C-Innovation sent a letter terminating the License Agreement,[59] telling Trendsetter "that it intends to move forward with new projects without payment of royalties."[60]  C-Innovation then filed this lawsuit seeking to have the '785 Patent declared invalid, unenforceable, and not infringed,[61] asserting that it "does not intend to make any substantial changes to its hydrate remediation process for future projects."[62]  Thereafter, Trendsetter offered to C-Innovation a covenant-not-to-sue agreement.[63]

---

[54] R. Docs. 11-1 at 11; 11-2 at 8 & 14.
[55] R. Doc. 11-2 at 8 & 14.
[56] R. Doc. 16 at 12-13.
[57] R. Doc. 16-1 at 8.
[58] R. Doc. 16 at 13.
[59] R. Docs. 11-1 at 11; 14-13.
[60] R. Doc. 14 at 13.
[61] R. Doc. 1
[62] R. Doc. 14 at 14.
[63] R. Doc. 17-3.

## II.     PENDING MOTION

Trendsetter urges that this case be dismissed for lack of personal jurisdiction.[64]  It argues that this Court cannot exercise specific personal jurisdiction over it because, as a Texas company that interacted with C-Innovation in Texas, Trendsetter has insufficient contacts with Louisiana.[65] Trendsetter's vice president attests that he is "not aware of any occasion in which any Trendsetter employee visited the State of Louisiana for any activities relating to licensure or enforcement of the '785 Patent."[66]  Trendsetter argues further that general jurisdiction would be inappropriate because it is not "at home" in Louisiana.[67]  In the alternative, Trendsetter argues that, under the standards of the Declaratory Judgment Act, the case should be dismissed for lack of a case or controversy.[68]  Trendsetter asserts that discretionary dismissal is warranted here because C-Innovation has engaged in forum-shopping by choosing to file suit in Louisiana.[69]  C-Innovation opposes the motion, arguing that personal jurisdiction is appropriate because its claims arise out of Trendsetter's actions in Louisiana.[70]  Additionally, C-Innovation argues that a controversy exists between the parties because Trendsetter has expressly and impliedly threatened litigation to enforce its patent and has interfered with C-Innovation's business.[71]

## III.    LAW & ANALYSIS

"As a general rule, when the court is confronted by a motion raising a combination of Rule 12(b) defenses, it will pass on the jurisdictional issues before considering whether a claim was

---

[64] R. Doc. 11-1 at 16-20.
[65] *Id.* at 16-17.
[66] R. Doc. 11-2 at 8.
[67] *Id.* at 17-19.
[68] *Id.* at 23-24.
[69] *Id.* at 24-25.
[70] R. Doc. 16 at 14-22.
[71] *Id.* at 22-29.

stated by the complaint." 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1351 (3d ed. 2004). Therefore, the Court will first consider whether it has personal jurisdiction over Trendsetter.

## A. Personal Jurisdiction

### 1. Rule 12(b)(2) standard

Federal Rule of Civil Procedure 12(b)(2) confers a right to dismissal of claims against a defendant where personal jurisdiction is lacking. Personal jurisdiction is "an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co*., 526 U.S. 574, 584 (1999) (internal quotation marks and alteration omitted). Because "the issue [of personal jurisdiction] 'is intimately involved with the substance of the patent laws,'" this Court must look to the law of the Federal Circuit. *Genetic Veterinary Scis., Inc. v. LABOKLIN GmbH & Co. KG*, 933 F.3d 1302, 1309 (Fed. Cir. 2019) (applying Federal Circuit law to determination of personal jurisdiction over out-of-state defendant-patentee in patent-infringement and declaratory-judgment action) (quoting *Grober v. Mako Prods. Inc.*, 686 F.3d 1335, 1345 (Fed. Cir. 2012)). A federal court may exercise personal jurisdiction over a non-resident defendant if (1) the forum state's long-arm statute confers personal jurisdiction over the defendant, and (2) the exercise of personal jurisdiction comports with due process under the United States Constitution. *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1361 (Fed. Cir. 2006). "Because Louisiana's long-arm statute extends to the limits of due process, the two inquiries collapse into a single inquiry: whether exercise of personal jurisdiction comports with due process." *Hockerson-Halberstadt, Inc. v. Propet USA, Inc.*, 62 F. App'x 322, 336 (Fed. Cir. 2003) (citations omitted). "Thus, the sole question here is whether the

exercise of jurisdiction would be consistent with due process." *Maxchief Invs. Ltd. v. Wok & Pan, Ind., Inc.*, 909 F.3d 1134, 1137 (Fed. Cir. 2018).

An individual's liberty interest is protected by federal due process through the requirement that individuals have "fair warning that a particular activity may subject [them] to the jurisdiction of a foreign sovereign." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring)). For purposes of personal jurisdiction, the due-process inquiry determines whether the defendant has purposefully availed itself of the benefits and protections of the forum state through "minimum contacts" with the forum, and whether the exercise of jurisdiction over the defendant "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "[P]ersonal jurisdiction 'is not susceptible of mechanical application.'" *Jack Henry & Assocs., Inc. v. Plano Encryption Techs. LLC*, 910 F.3d 1199, 1205 (Fed. Cir. 2018) (quoting *Kulko v. Superior Ct.*, 436 U.S. 84, 92 (1978)).

Personal jurisdiction may be general or specific. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). For a court to exercise general jurisdiction, the defendant's contacts with the forum must be "so continuous and systematic" as to render the defendant "at home" in the forum state. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (citing *Goodyear*, 564 U.S. at 919). In analyzing specific jurisdiction, the Federal Circuit employs a three-prong test in which it determines whether "(1) the defendant purposefully directed its activities at residents of the forum, (2) the claim arises out of or relates to those activities, and (3) assertion of personal jurisdiction is reasonable and fair." *Avocent Huntsville Corp. v. Aten Int'l Co.*, 552 F.3d 1324, 1332 (Fed. Cir. 2008) (quoting *Breckenridge*, 444 F.3d at 1363). After the plaintiff establishes the first two factors, which correspond with the "minimum contacts" prong of *International Shoe*, the

burden shifts to the defendant to demonstrate that an exercise of personal jurisdiction would be unfair or unreasonable. *Burger King*, 471 U.S. at 477 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)); *see also Xilinx, Inc. v. Papst Licensing GmbH & Co. KG*, 848 F.3d 1346, 1354-55 (Fed. Cir. 2017) ("'Our personal jurisdiction precedents call for a two-part analysis. The contacts prong asks whether the defendant has sufficient contacts with the forum State to support personal jurisdiction; the reasonableness prong asks whether the exercise of jurisdiction would be unreasonable under the circumstances.'") (quoting *Daimler*, 571 U.S. at 144 (Sotomayor, J., concurring)). In determining reasonableness, a court considers "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief," *Asahi Metal Indus. Co. v. Super. Ct.*, 480 U.S. 102, 113 (1987), as well as "the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies." *World-Wide Volkswagen*, 444 U.S. at 292.

"Where the district court's disposition as to personal jurisdiction is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only make a prima facie showing that defendants are subject to personal jurisdiction." *Genetic Veterinary Scis.*, 933 F.3d at 1309. The court must "'accept the uncontroverted allegations in the plaintiff's complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor.'" *Xilinx*, 848 F.3d at 1352 (quoting *Avocent*, 552 F.3d at 1329).

2. **Analysis**

a. **Trendsetter has sufficient minimum contacts with Louisiana to support specific personal jurisdiction.**

First, the Court must consider whether Trendsetter has sufficient contacts with the forum state to support personal jurisdiction.  In declaratory-judgment actions for noninfringement or invalidity, a "claim arises out of the patentee's contacts with the forum state only if those contacts 'relate in some material way to the enforcement or the defense of the patent.'"  *Maxchief*, 909 F.3d at 1138 (quoting *Avocent*, 552 F.3d at 1336).  Enforcement letters are relevant contacts to establish specific personal jurisdiction.  "In the context of declaratory judgment actions involving assertions of patent noninfringement or invalidity, [the Federal Circuit has] concluded that cease-and-desist letters sent by the patentee defendant into the forum are relevant contacts in the personal jurisdiction analysis."  *Xilinx,* 848 F.3d at 1354.  "Minimum contacts may be established by 'the threat of an infringement suit, as communicated in a cease-and-desist letter.'"  *Id.*; *see also New World Int'l, Inc. v. Ford Global Techs., LLC*, 859 F.3d 1032, 1037 (Fed. Cir. 2017) ("This court has acknowledged that the defendant purposefully directs his activities at residents of the forum when the defendant sends a cease and desist letter to a potential plaintiff in that particular forum.").

Minimum contacts also can be established by a variety of other enforcement-related activities.  *See, e.g., Elecs. for Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1351 (Fed. Cir. 2003) (holding there was specific jurisdiction over the defendant-patentee who hired a lawyer in the forum state, made phone calls into the state regarding the subject matter of the technology covered by the patent, and whose employees visited the plaintiff-company's facility in the forum state); *Inamed Corp. v. Kuzmak*, 249 F.3d 1356, 1362 (Fed. Cir. 2001) (holding there was specific jurisdiction over defendant-patent-holder who sent an infringement letter to the forum state and

12

who negotiated a license agreement by phone calls and emails directed to the forum state even though he did not physically go there).  Most importantly, for our purposes, the Federal Circuit has upheld specific jurisdiction when "the defendants took steps to interfere with the plaintiff's business by enlisting a third party to take action against the plaintiff."  *Campbell Pet Co. v. Miale*, 542 F.3d 879, 888 (Fed. Cir. 2008).

Here, in connection with a project to deploy from Louisiana, Trendsetter sent notices to both C-Innovation and its client advising them of the '785 Patent.  C-Innovation characterizes the notices as enforcement letters; Trendsetter disagrees.  C-Innovation's client allegedly concluded that the notice was an enforcement action, construing it as threatening litigation.  Regardless, there is no definitive allegation in the complaint, or showing in the record before the Court, that the communications were directed to Louisiana, so they themselves cannot constitute the requisite minimum contacts.  However, the communications must be considered in the context of Trendsetter's overall objective for its enforcement-related activities.  The notices advised both C-Innovation and its client of Trendsetter's patent for the purpose of influencing their decisions about moving forward with the Louisiana project.  As alleged in the complaint, Trendsetter's business goal was to extract a license agreement from C-Innovation, a Louisiana company, to use the process covered by the '785 Patent in connection with its client's project deploying from Louisiana.  C-Innovation thus claims that Trendsetter's actions, taken together, amount to interference with C-Innovation's business in Louisiana by enlisting the third-party client to pressure C-Innovation to obtain a license for the process from Trendsetter.  *See Campbell Pet*, 542 F.3d at 888.  The result of these communications, then, was that C-Innovation and Trendsetter entered into the License Agreement that was executed by Chouest on behalf of C-Innovation at its

Louisiana office and permitted C-Innovation and its client to use the patent for a project mobilized from Louisiana.

Typically, license agreements on their own are not enough to establish minimum contacts. "[O]ur case law requires that the license agreement contemplate a relationship beyond royalty or cross-licensing payment, such as granting both parties the right to litigate infringement cases or granting the licensor the right to exercise control over the licensee's sales or marketing activities." *Breckenridge*, 444 F.3d at 1366.  The License Agreement in this case effectively forged an ongoing relationship between the parties by requiring C-Innovation "to request approval from Trendsetter to move forward with each prospective project."[72]  The terms of the agreement then required Trendsetter to notify C-Innovation at its office in Mandeville, Louisiana, whether it would grant the license for the requested project.[73]  According to the complaint, this allowed Trendsetter to enforce its patent rights by requiring C-Innovation to renew the license every time it had a new prospect for hydrate-remediation work.  In this way, Trendsetter purposefully directed its activities at C-Innovation in the forum state, and C-Innovation's declaratory-judgment claims for patent invalidity, unenforceability, and noninfringement arise out of or are related to these activities.

In addition, C-Innovation alleges that "the '785 Patent does not accurately identify the true inventors of the claimed invention," and that "the '785 Patent includes drawings that were plagiarized from persons who are omitted as inventors."[74]  C-Innovation thus seeks to invalidate the '785 Patent on the ground that Trendsetter only became aware of the method it claims by means of the 2015 Project's technical reports and schematic drawings shared at the 2016 meetings in

---

[72] R. Doc. 14 at 12-13.
[73] R. Doc. 14-12 at 2-3.
[74] R. Doc. 14 at 2; *see also id.* at 17-18 ("The claims of the '785 Patent, including Claim 1, are invalid under 35 U.S.C. §§ 101 and 115(a) for failure to name the true inventors.").

Louisiana. Louisiana, then, was the situs for the wrongful conduct from which all of C-Innovation's patent claims against Trendsetter flow, and Trendsetter's defense of the '785 Patent essentially begins there. *See, e.g.*, *Cray, Inc. v. Raytheon Co.,* 179 F. Supp. 3d 977, 980-81 (W.D. Wash. 2016) (holding specific jurisdiction existed on correction of inventorship claim where defendant-patentee filed patent applications relying on information acquired from plaintiff located in the forum state).

In sum, Trendsetter's activities concerning enforcement and defense of its patent, including its alleged misappropriation of the hydrate-remediation method, its litigation threats, the negotiation and execution of the License Agreement for a Louisiana project, and the agreement's continuing obligations between Trendsetter in Texas and C-Innovation in Louisiana to approve the license for each new project, provide sufficient minimum contacts with Louisiana to support specific personal jurisdiction.

### b.  Asserting personal jurisdiction over Trendsetter will not offend traditional notions of fair play and substantial justice.

"The inquiry under the reasonableness prong (step two) is not limited to the specific facts giving rise to, or relating to, the particular litigation. 'Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of *other factors* to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice."'" *Xilinx,* 848 F.3d at 1355 (quoting *Burger King*, 471 U.S. at 476) (emphasis in original). These "other factors" must be analyzed by "looking to circumstances beyond those that give rise or relate to the specific lawsuit." *Id.* The defendant must show a "'compelling case' under *Burger King* that jurisdiction is unreasonable." *Id.* at 1356 (quoting *Burger King*, 471 U.S. at 477). Thus, on the one hand, at this stage of the inquiry, warning

or enforcement letters are not enough.  *Id.* at 1357.[75]  But, on the other hand, "defeats of otherwise constitutional personal jurisdiction are limited to the *rare* situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Campbell Pet*, 542 F.3d at 885 (quotation marks omitted; emphasis added).  In this reasonableness inquiry, the court considers "(1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies."  *Id.* (quoting *Elecs. for Imaging*, 340 F.3d at 1351-52).

This case does not present the rare situation where the defendant would be unduly burdened by litigating in this forum.  Trendsetter argues that subjecting it to a patent action here "violates the principles of fair play and substantial justice because it would be inconvenient, unreasonable and unfair."[76]  Even if proceeding in Louisiana will be inconvenient for Trendsetter, as it asserts, this inconvenience does not meet the high standard required.  Trendsetter regularly conducts business both internationally and domestically, including in Louisiana, so its burden is hardly

---

[75] *See also Maxchief*, 909 F.3d at 1139 (holding that sending notice letters of patent infringement "does not satisfy the 'fair play and substantial justice' prong of the personal jurisdiction inquiry, because principles of fair play 'afford a patentee sufficient latitude to inform others of its patent rights without subjecting itself to jurisdiction in a foreign forum'"); *New World Int'l*, 859 F.3d at 1037-38 ("Under the third part of the test, however, this court has held that it is improper to predicate personal jurisdiction on the act of sending ordinary cease and desist letters into a forum, without more."); *Silent Drive, Inc. v. Strong Indus., Inc.*, 326 F.3d 1194, 1202 (Fed. Cir. 2003) ("We have decided that under the third of these tests the sending of letters threatening infringement litigation is not sufficient to confer personal jurisdiction.").

[76] R. Doc. 11-1 at 19-20.  Trendsetter argues it is unreasonable because it "(1) places an extraordinary burden on Trendsetter, (2) Texas' interests in the matter far exceed Louisiana since both [Trendsetter] and [C-Innovation] operate their respective business out of Houston and perform work for Houston based third party companies, 3) [C-Innovation's] interest in securing relief is greater in Houston where it operates, and 4) judicial resolution of any controversy would be most efficiently undertaken in Houston where all apparent witness [*sic*] reside."  *Id.* at 20.

16

"extraordinary" as it claims.  The state of Louisiana has an interest in this patent dispute to the extent it may affect oil-and-gas projects in or mobilized from the state.  Further, C-Innovation, as a Louisiana company, has an interest in obtaining relief in Louisiana, especially since the project requiring the license was launched from this state and uses a method C-Innovation alleges was misappropriated by Trendsetter at a meeting in the state.  Therefore, this is not a case "in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum."  *Campbell Pet*, 542 F.3d at 885.  Moreover, resolution of a patent dispute can be obtained as efficiently in this Court as a Texas federal court (although it may be less convenient for most witnesses), and both Louisiana and Texas share the same interest in furthering the substantive social policies underlying the federal patent law applicable to this dispute.  Having determined that this Court has specific personal jurisdiction over Trendsetter, the Court now considers the second question raised by Trendsetter's motion, namely, whether there is a case or controversy.

**B.  Case or Controversy**

**1.  Rule 12(b)(6) standard**

The Federal Rules of Civil Procedure require a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Rule 8 "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The statement of the claim must "'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Twombly*, 550 U.S. at 555 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  A pleading does

17

not comply with Rule 8 if it offers "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557) (alteration omitted).  The Federal Circuit reviews motions to dismiss "under the law of the regional circuit." *Boom! Payments, Inc. v. Stripe, Inc.*, 2021 WL 116545, at *3 (Fed. Cir. 2021) (citing *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015)); *see also Simio, LLC v. Flexsim Software Prods., Inc.*, 983 F.3d 1353, 1358 (Fed. Cir. 2020).

Rule 12(b)(6) of the Federal Rules of Civil Procedure permits a party to move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible on the face of the complaint "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Plausibility does not equate to probability, but rather "it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556).  "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Thus, if the facts pleaded in the complaint "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration omitted).

In considering a Rule 12(b)(6) motion to dismiss for failure to state a claim, a court employs the two-pronged approach utilized in *Twombly*.  The court "can choose to begin by identifying

18

pleadings that, because they are no more than conclusions [unsupported by factual allegations], are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679.  However, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*  "[The] task, then, is to determine whether the plaintiff has stated a legally cognizable claim that is plausible, not to evaluate the plaintiff's likelihood of success." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 385 (5th Cir. 2017) (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist.*, 675 F.3d 849, 854 (5th Cir. 2012)).  Motions to dismiss are disfavored and rarely granted.  *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (citing *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

A court's review of a Rule 12(b)(6) motion to dismiss "is limited to the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000)).  A court may also take judicial notice of certain matters, including public records and government websites.  *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008); *see also Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 457 (5th Cir. 2005).  Thus, in weighing a Rule 12(b)(6) motion, district courts primarily look to the allegations found in the complaint, but courts may also consider "documents incorporated into the complaint by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned."  *Meyers v. Textron, Inc.*, 540 F. App'x 408, 409 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)).

**2. C-Innovation has presented a case or controversy ripe for adjudication under the Declaratory Judgment Act.**

The Declaratory Judgment Act allows a court to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). "'Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)). In patent cases, "the nature of the claim in a declaratory judgment action is 'to clear the air of infringement charges.'" *Avocent*, 552 F.3d at 1332 (quoting *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998)).

A party does not have to put itself in danger of infringing a patent in order to question its validity. The Supreme Court has held that a party is "not required, insofar as Article III is concerned, to break or terminate its … license agreement before seeking a declaratory judgment in federal court that the underlying patent is invalid, unenforceable, or not infringed." *MedImmune, Inc.*, 549 U.S. at 137. Here, C-Innovation and its client received communications from Trendsetter which they interpreted as threats of litigation to enforce the '785 Patent. As a result, C-Innovation was allegedly compelled to enter into the License Agreement for the project with that client. In other words, "the threat-eliminating behavior [*i.e.*, the License Agreement] was effectively coerced." *Id.* at 129. Since then C-Innovation has felt increasingly constrained by the License Agreement and has now terminated the agreement, asserting that it "does not intend to

make any substantial changes to its hydrate remediation process for future projects."[77]  Therefore, the hydrate-remediation projects C-Innovation will undertake in the future present the same potential for litigation over the patent as did the project that led Trendsetter to threaten litigation over its patent in the first place.

Trendsetter argues that "there exists no definite and concrete dispute sufficient to confer standing under the Declaratory Judgment Act"[78] because the "facts pled in this case lack any evidence of the immediacy and reality required to support DJ jurisdiction."[79]  Specifically, Trendsetter says C-Innovation's claims are not ripe for adjudication because it points to no hydrate-remediation projects that are concrete.  This argument ignores C-Innovation's history (some of which is expressly pleaded) of landing and performing such projects.  C-Innovation is not a start-up business, nor does its hydrate-remediation services employ an untested method.  This history, including notably the parties' own entry into a license agreement anticipating future projects, entails meaningful preparations and C-Innovation's concrete intention to use the hydrate-remediation method in dispute.  The complaint calls for no mere advisory opinion.

In its reply, Trendsetter points to a covenant not to sue it has proposed, arguing that the covenant moots the alleged controversy.  A party cannot simply disclaim their prior behavior in order to avoid litigation not of its choosing.  "Given this concern, our cases have explained that 'a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur.'"  *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).  The burden falls on

---

[77] R. Doc. 14 at 14.
[78] R. Doc. 11-1 at 24.
[79] R. Doc. 20 at 6.

21

the party issuing the covenant "to show that it 'could not reasonably be expected' to resume its enforcement efforts against" the other party. *Id.* at 92 (quoting *Friends of the Earth*, 528 U.S. at 190). In *Already*, the Supreme Court held that a case was moot when defendant Nike, Inc.'s covenant not to sue was "unconditional and irrevocable" and plaintiff Already, LLC could not demonstrate "that it engages in or has sufficiently concrete plans to engage in activities not covered by the covenant." *Id.* at 93-94. Basically, "whether a covenant not to sue will divest the trial court of jurisdiction depends on what is covered by the covenant." *Id.* at 101 (alteration omitted). Nike had covenanted not to sue for past, present, and future colorable imitations of Already's existing shoe lines (including those Nike had previously claimed infringed its trademark). *Id.* at 93. In explaining the determinative breadth of Nike's covenant, the Supreme Court whimsically observed that the hypothetical shoe not covered must be sitting "on a shelf between Dorothy's ruby slippers and Perseus's winged sandals." *Id.* at 94.

The covenant in this case is not nearly as broad. Trendsetter promises not to sue C-Innovation only if it uses the method for flow-line hydrate remediation covered in U.S. Patent No. 10,344,549, which describes the method employed in the 2015 Project.[80] The last time C-Innovation planned to use this method, though, Trendsetter allegedly threatened C-Innovation and its client with litigation and C-Innovation ended up paying royalties to Trendsetter on the basis of its '785 Patent. It is not unreasonable, then, for C-Innovation to observe that "Trendsetter views the remediation method practiced by C-Innovation as infringing its patent,"[81] even if C-Innovation does not share this view. Given this history, the covenant not to sue cannot satisfy Trendsetter's burden to show that it could not reasonably be expected to resume its enforcement efforts against

---

[80] R. Doc. 17-3 at 2.
[81] R. Doc. 16 at 9 (citing R. Docs. 14 at 12; 16-1 at 5-6); *see also* R. Doc. 14 at 2 ("Trendsetter refuses to concede … that the services offered by C-Innovation do not infringe the '785 Patent.").

C-Innovation.  Because the dispute between the parties turns on what is covered by the respective patents, Trendsetter's promise does little to move this case closer to resolution.  Said another way, for Trendsetter's covenant to have had the same result as Nike's in *Already*, it should have promised not to sue for past or future use of any system using the method covered by the '785 Patent.  This Trendsetter most assuredly did not do.

## IV.    CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that the motions of defendant Trendsetter Engineering, Inc. to dismiss for lack of personal jurisdiction and/or case or controversy (R. Docs. 11 & 21) are DENIED.

New Orleans, Louisiana, this 26th day of January, 2020.


BARRY W. ASHE
UNITED STATES DISTRICT JUDGE